# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR416-353-003 |
| | ) | |
| DESHAWN BINAH REILLY | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Defendant Deshawn Reilly has requested a determination, pursuant to *Jackson v. Denno*, 378 U.S. 386 (1963), whether statements he made to law enforcement were voluntary. *See* doc. 206. The Government maintains that the challenged statements were made after Reilly was advised of his constitutional rights, in compliance with *Miranda v. Arizona*, 384 U.S. 436 (1966), and he knowingly and voluntarily waived those rights. Doc. 248 at 6. On July 12, 2017, the Court held a hearing to evaluate the voluntariness of Reilly's statements.

## I. Facts

The facts below are drawn from the testimony of two United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) special agents who interviewed Reilly. The first, Agent John Judkins, testified at the July 12 hearing. The transcribed testimony of Agent Johnathan

Gray from a previous hearing in the Northern District of Georgia was entered into evidence without objection.[1] Reilly did not present any evidence and did not testify. The facts related in the agents' testimony thus stand undisputed.[2]

On March 19, 2014, law enforcement was notified of a possible straw purchase of a firearm. They initiated surveillance and followed Reilly and his then-girlfriend, Curel Taylor, to a residence near Atlanta, Georgia. Prior to the surveillance, they were informed that Reilly was a convicted felon and they were aware that the purchased firearms were in the trunk of the car. After Reilly and Taylor parked the car at the residence, agents observed him move toward the trunk. The agents then decided to make contact with Reilly and Taylor.

---

[1] The atypical circumstances of Reilly's motion bear further comment. The admissibility of Reilly's statements to agents Judkins and Gray has been challenged before in Reilley's prosecution in the Northern District of Georgia. That Court found that his statements were voluntarily made. *See* Gov't Ex. 5 (Report and Recommendation); Ex. 6 (Order adopting Report and Recommendation). The parties agreed at the hearing that, although the issues faced are the same, the prior voluntariness determination is not binding on this Court.

[2] At the hearing Reilly, through counsel, raised the possibility that a video and/or audio recording of the interview was captured by a surveillance system installed at the residence where the interview took place. The Government has filed a supplemental response to his motion indicating that, although such a system was discovered during the search of the residence, no recording was seized so "there is no recording of the interview . . . in the possession of the government or known to the government." Doc. 292 at 2.

Agents Gray and Judkins pulled into the driveway of the residence, and Reilly approached them. As he approached, the agents observed a "bulge" in the front pocket of the hooded sweatshirt he was wearing. At that point, the agents drew their weapons. Judkins directed Reilly to stop moving and take his hands out of the pocket. Reilly complied and Judkins conducted a pat-down search to determine whether he was armed. He found several cellular phones, keys, Reilly's wallet, and some papers in his pocket. Those items were placed on a nearby car. After confirming Reilly was unarmed, the agents holstered their weapons.

The agents began their interview by asking Reilly to identify himself. He complied and invited the agents to look in the wallet for his I.D. When they searched the wallet, the agents discovered several identification cards, all of which had Reilly's photograph but reflected different names, dates of birth, and addresses. After discovering the multiple identification cards, agents placed Reilly in handcuffs, advising him that, although he was not under arrest, he was being detained. Agent Judkins testified that he placed Reilly in handcuffs because he was concerned that, when confronted with the multiple I.D.'s, Reilly might try to fight or flee. Reilly's hands were initially cuffed behind his back,

3

but at some point in the interview agents re-cuffed his hands in front of him. He remained handcuffed throughout the interview. Agent Judkins then advised Reilly of his *Miranda* rights, reading them verbatim from a card he carried along with his credentials. Reilly acknowledged that he understood his rights and indicated that he was willing to speak with the agents.

As the agents spoke to Reilly, he appeared calm. Nothing about his demeanor indicated to the agents that he was intoxicated or impaired in any way. The interview was conversational; neither the agents nor Reilly raised their voices. He advised them that he wanted to cooperate. The agents did not make any promises or offer any inducements for Reilly's waiver of his rights. The interview continued for several hours (perhaps as long as 8 hours) while a search warrant for the residence was procured and executed. Despite the length of the interview, there were several breaks, including bathroom breaks and a meal break when agents provided Reilly with pizza and water. Reilly never expressed any discomfort or displayed any distress. He also never indicated that he wished to limit or revoke his waiver of his rights. At the end of the interview, he was placed under arrest.

## II. Analysis

It is clear that Reilly was in custody when he spoke to the agents,[3] that they advised him of his *Miranda* rights, and that he continued to speak with the agents after being so advised. Whether the statements are admissible, therefore, depends upon whether his waiver of his rights was knowing and voluntary. *See North Carolina v. Butler*, 441 U.S. 369, 374 (1979); *United States v. Watts*, 2016 WL 6652470 at * 2 (S.D. Ga. Oct. 13, 2016) ("Since [defendant] was adequately appraised of his rights, the only question is whether he effectively waived those rights.").

---

[3] Whether a suspect is "in custody," depends upon "whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotes and cite omitted). Despite the sensitivity of the test to the circumstances of the interrogation, it remains an objective inquiry. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (evaluation of custody is context-sensitive, but objective); *see also United States v. Eubank*, 2015 WL 3557493 at * 6 (S.D. Ga. Mar. 18, 2015). The circumstances of the interrogation are evaluated from the perspective of "the reasonable innocent person." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006); *Eubank*, 2015 WL 3557493 at * 6 ("The test [for custody] is an objective one: taking into account all the circumstances surrounding the interrogation, would a reasonable person -- one innocent of any wrongdoing -- have felt that he was not free to terminate the interview and leave." (cites omitted)).

Although the agents initially told Reilly that he was not under arrest, the Court finds that the circumstances here -- the application of handcuffs upon the discovery of incriminating evidence (multiple fake I.D.'s) and the length of the encounter -- would have suggested to a reasonable person that they were not merely detained temporarily for investigative purposes but were restrained to "the degree associated with formal arrest."

The constitutional protection against self-incrimination includes *Miranda* warnings that a suspect's statements may be used against him, and the more general Due Process requirement that there must be a "voluntary, knowing, and intelligent waiver" of a suspect's rights before "uncounseled incriminating statements made during a custodial interrogation may be admitted." *United States v. Lall*, 607 F.3d 1277, 1282-83 (11th Cir. 2010) (citing *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991)). Custodial interrogation presents a sufficient specter of coercion that failure to comply with *Miranda*'s requirements creates a presumption that a confession was not voluntary. *Id.* at 1285 (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *Jarrell v. Balkcom*, 735 F.2d 1242, 1252 (11th Cir. 1984)). And if the Government contends that a suspect waived his *Miranda* rights, it must show that the waiver was "voluntary, knowing and intelligent" by establishing: (1) that "'the relinquishment of the right [was] voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception[;]'" and (2) it "'must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* at 1283 (quoting *Moran*

6

*v. Burbine*, 475 U.S. 412, 421 (1986)). "A criminal suspect is not required to know and understand every possible consequence of a waiver for it to be knowingly and intelligently made[;]" it is enough if he understands that he may choose not to speak to law enforcement, speak only with counsel present, and to stop speaking at any time. *United States v. Gaddy*, 894 F.2d 1307, 1312 (11th Cir. 1990).

Reilly has neither alleged nor identified in the record a single fact that suggests that his waiver of his *Miranda* rights was anything other than voluntary and knowing. *See* doc. 206. In order for a suspect's waiver to be involuntary, "coercive police activity is a necessary predicate." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). There is no suggestion, or indeed any allegation, of any such activity here. In fact the agents' uncontroverted testimony explicitly disclaims any express coercion and supports the conclusion that Reilly's waiver was voluntarily and intelligently made. Nor is there any suggestion or allegation that Reilly did not understand the meaning of his waiver. *See, e.g. Miller v. Dugger*, 838 F.2d 1530, 1539 (11th Cir. 1988) (identifying youthfulness, mental illness, and language difficulties as examples of deficiencies that can invalidate a waiver of *Miranda* rights). He did not allege any deficit

in his understanding of the agents' explanation of his right to refuse to speak with them or to demand the presence of counsel. Nothing in the uncontradicted record supports a conclusion other than that Reilly's waiver was voluntarily and intelligently made.

### III. Conclusion

The Court finds that Reilly's statements to law enforcement officers on March 19, 2014 were voluntarily made, after he was advised of his *Miranda* rights, and he knowingly and intelligently waived those rights. His motion to suppress those statements as involuntary, doc. 206, should, therefore, be **DENIED**.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. U.S.*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this <u>4th</u> day of August, 2017.

*/s/ G.R. Smith*
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA